[Civ. No. 4484.  Second Appellate District, Division One.—April 5, 1927.]

## JOHN M. THILLE, Respondent, v. BOARD OF PUBLIC WORKS OF THE CITY OF LOS ANGELES et al., Appellants.

[1] MUNICIPAL CORPORATIONS—SET-BACK ORDINANCE.—In this proceeding, an ordinance of the City of Los Angeles ordering that on a certain portion of a designated street buildings or structures should be set back a minimum distance of thirty feet was held to have a reasonable basis within the charter of said city and the state constitution, and, as to petitioner, was not unreasonable or confiscatory.

(1) 43 C. J., p. 199, n. 55, p. 200, n. 60, p. 207, n. 72, p. 308, n. 38, p. 335, n. 51, p. 336, n. 73, p. 338, n. 5, p. 346, n. 18.

APPEAL from a judgment of the Superior Court of Los Angeles County.  Ralph H. Clock, Judge.  Reversed.

The facts are stated in the opinion of the court.

Jess E. Stephens, City Attorney, Lucius P. Green, Assistant City Attorney, and Chas. B. MacCoy, Deputy City Attorney, for Appellants.

Vernon M. Brydolf for Respondent.

Wm. J. Locke, J. Leroy Johnson, Archer Bowden, S. J. Higgins, Leon E. Gray, Robert L. Shinn, John J. O'Toole, Loren E. Butts and Earl J. Sinclair, *Amici Curiae*.

YORK, J.—The merits of this appeal rest upon a certain ordinance adopted by the city council of the city of Los Angeles on the fourteenth day of July, 1922, designated a "set-back ordinance." In that ordinance the city council "determined that the public peace, health, safety, comfort, convenience, interest and welfare require and it is hereby ordered that the minimum distance back from the street line for the erection of buildings or structures to be designated as 'set-back lines' on Lake street between Bellevue avenue and Temple street," for certain distances on either side of said North Lake Street should be thirty feet; and enacted that it should be unlawful to construct any buildings, etc., between the lines of the street and said "set-back" lines.

The plaintiff on the 7th of March, 1923, made an application in due form to the Board of Public Works of the City of Los Angeles for a permit to erect a garage at No. 458 North Lake Street, in said city, which permit was refused on the ground that the application did not show that the place where it was proposed to erect such garage was not within the said thirty feet between the established "set-back" line and the line of the street. This action is prosecuted by plaintiff against the Board of Public Works, consisting of Charles H. Treat, Hugh J. McGuire, and Edward J. Delorey as members of the Board, and J. J. Backus, as Chief Inspector of Buildings of said city, asking for a writ of mandate requiring the issuance of such permit. The superior court held that the ordinance was void, and ordered the issuance of the writ of mandate as prayed. The defendants have appealed from the judgment, which judgment was entered June 25, 1923.

Said "set-back" ordinance was adopted in accordance with another ordinance adopted by said city council on December 13, 1921, No. 42,882 (New Series), known as a "set-back" ordinance, which provides for the establishment by the city council of a line along any portion of any street in the city of Los Angeles, and prohibits the con-

struction of any building or structure between such line and the street line. The general ordinance prescribes the method of procedure in the establishing of such lines, provides for a notice of intention to adopt the same, and a hearing thereon at a time and place to be designated, and provides that prior to the time such ordinance establishing such line, etc., shall be effective, no building permit shall be issued for the erection of any building between the line proposed to be established and the line of the street. Under this ordinance the council has reserved the power to deny any and all protests, and adopt an ordinance establishing or refusing to establish a "set-back" line.

[1] Appellants contend that the judgment of the trial court was erroneous, and contend that said ordinances were in accordance with the police powers of said city, and the question involved is whether it was shown that such "set-back" ordinances are in accordance with article XI, section 11, of the constitution of the state of California, which provides that "any county, city, town, or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws." Respondent contends also that such ordinances are in violation of the fourteenth amendment of the constitution of the United States. Our attention has not been called to any general law with which either of said ordinances is in conflict. By an amendment of the constitution of California, adopted in 1914, it is provided that, "cities . . . hereafter organized under charters framed and adopted by authority of this Constitution are hereby empowered, and cities . . . heretofore organized by authority of this Constitution may amend their charters, . . . so as to become likewise empowered hereunder, to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws." It has therefore been held that such city charters operate as a limitation and not a grant of power, and hence should be strictly construed. The city charter of the city of Los Angeles comes within this rule.

The tendency to a more liberal construction of the police power, as applied in zoning and other regulatory laws, is

shown in such decisions as *Miller* v. *Board of Public Works,* 195 Cal. 477 [38 A. L. R. 1479, 234 Pac. 381], and *Zahn* v. *Board of Public Works,* 195 Cal. 497 [234 Pac. 388]. In the Miller case the supreme court said: "As a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions. What was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power. This is so because: 'What was a reasonable exercise of this power, in the days of our fathers may today seem so utterly unreasonable as to make it difficult for us to comprehend the existence of conditions that would justify same; what would by our fathers have been rejected as unthinkable is today accepted as a most proper and reasonable exercise thereof.' (*Streich* v. *Board of Education,* 34 S. D. 169 [Ann. Cas. 1917A, 760, L. R. A. 1915A, 632, 147 N. W. 779].) . . .

"Thus it is apparent that the police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life and thereby keep pace with the social, economic, moral and intellectual evolution of the human race. In brief, 'there is nothing known to the law that keeps more in step with human progress than does the exercise of this power.' "

In providing for the common welfare the statutes of California take into consideration "open space for light," "ventilation," "health," "comfort," and "convenience"; even sentiment has had an influence in extending the limitations of the exercise of police powers. Police power embraces in its most comprehensive sense the whole system of internal regulation, and extends to the protection of all persons within its jurisdiction, and their health, comfort, and quiet. As was said by the supreme court in *Chicago & A. R. Co.* v. *Tranbarger,* 238 U. S. 67 [59 L. Ed. 1204, 35 Sup. Ct. Rep. 678, see, also, Rose's U. S. Notes], "And it is also settled that the police power embraces regulations designed to promote the public convenience or the general welfare and prosperity, as well as those in the interest of the public health, morals, or safety." (See, also, *Sligh* v.

*Kirkwood,* 237 U. S. 52 [59 L. Ed. 835, 35 Sup. Ct. Rep. 501].) The limitation of police powers has been expanding slowly but surely for several years. The case of *Lawton* v. *Steele,* 152 U. S. 133 [38 L. Ed. 385, 14 Sup. Ct. Rep. 499], seems to change former decisions defining police powers to such an extent that Chief Justice Fuller wrote a dissenting opinion, which was concurred in by Justice Field and Justice Brewer. But we have found no case where the authority of the majority decision has ever been questioned. That decision was rendered March 5, 1894. In his dissenting opinion Chief Justice Fuller said: ''The police power rests upon necessity and the right of self-protection, but private property cannot be arbitrarily invaded under the mere guise of police regulation.'' The question involved was the right to destroy property under a law of New York, which property was being used in violation of a prohibitory law, and which had been summarily destroyed. The property destroyed was valued at $525. The contention was that, notwithstanding the New York statute, the owners should have had an opportunity to defend their rights in the property in court. Gradually police powers have been extended until we have the decisions of our supreme court in the Miller and Zahn cases, *supra,* which set up an authority and rule far in advance of the cases which the respondent has cited, all of which cases cited were decided long before the Miller and Zahn cases, and of course such cases cited have no controlling force wherein they are not in accord therewith. As was said in the case of *Zahn* v. *Board of Public Works, supra* (p. 514), '' . . . we are well satisfied that the weight of authority dealing with the subject of zoning may now be regarded as establishing that 'every intendment is to be made in favor of zoning ordinances, and courts will not, except in clear cases, interfere with the exercise of the power thus manifested.' '' *Miller* v. *Board of Public Works, supra,* was also quoted in the case of *Zahn* v. *Board of Public Works,* as follows: '' 'The courts are loath to substitute their judgment as to the necessity for a particular enactment for the legislative judgment as to the need of such an enactment with reference to the exercise of the police power. A large discretion is vested in the legislative branch of the government with reference to the exercise of the police power. Every intendment is to be indulged

by the courts in favor of the validity of its exercise and unless the measure is clearly oppressive it will be deemed to be within the purview of that power. It is only when it is palpable that the measure in controversy has no real or substantial relation to the public health, safety, morals or general welfare that it will be nullified by the courts.' "

In other words, the question is not whether the city council acted wisely, but whether it acted so oppressively and irrationally as to justify a court in holding that the city council exceeded its authority and imposed harsh and unreasonable ordinances from motives not intended for the public welfare. As held in *Hebe Co.* v. *Shaw*, 248 U. S. 297 [63 L. Ed. 255, 39 Sup. Ct. Rep. 125, see, also, Rose's U. S. Notes], if the question of public welfare be debatable, the city council is entitled to its own judgment, and that judgment is not to be superseded by the opinion of a court.

Police power is not subject to definite limitations, but is coextensive with the necessities of the case and the safeguards of public interest. It embraces regulations designed to promote public convenience, or the general prosperity, or welfare, as well as those specifically intended to promote the public safety, or the public health. Whether it is a valid exercise of the police power is the question in this case, and that power, as far as it is capable of definition, extends not only to regulations as to morals, and safety, but to those which tend to promote the public convenience.

The case of *Varney & Green* v. *Williams*, 155 Cal. 318 [132 Am. St. Rep. 88, 21 L. R. A. (N. S.) 741, 100 Pac. 867], cited by respondent, pertains to a decided prohibition of the use of property for maintaining billboards, except to advertise goods for sale by the owner of the property on which the signs are maintained. The supreme court said in that case: "We find that the one ground upon which the town council may be thought to have acted is that the appearance of billboards is, or may be, offensive to the sight of persons of refined taste." In other words, holding that an ordinance cannot be sustained which inhibits a use of property or restricts its use solely on esthetic grounds. The contention that there was no other than esthetic grounds to sustain the ordinance in question in this case at bar cannot be sustained. The cases cited in the last-named case, wherein they are not in accord with the Miller and

Zahn cases, are, of course, not authority in determining the points involved in this case. The case of *Varney & Green* v. *Williams, supra,* was decided almost fifteen years before the Miller and Zahn cases, and the authorities cited in the *Varney & Green* v. *Williams* case were, of course, much more ancient than that. It is clear that the ordinance in question is regulative, and not confiscatory.

Zoning ordinances are now being held to be for the public welfare, basing the consideration on fire protection, safety, and security of human life, prevention of street accidents—especially to children—by reducing the traffic congestion in residential districts, and danger of collision, with the resultant damages, and even when based on the decrease of noises in residential areas of a character that tend to produce "nervous disorders," may be "debatable" though not void. Changes in living conditions during a comparatively few years have brought corresponding changes in the exercise of police powers, and those advancements are recognized in construing ordinances alleged to be in conflict with them.

In the case under consideration the city council may have concluded, without being arbitrary or intentionally unreasonable, that the public welfare would have been subserved, danger from fires lessened, danger from street traffic lessened, without injustice to plaintiff. There was a twenty-foot alley in the rear of the lots in the district where plaintiff's lot was located. The alley runs in from North Lake Street and *connects* with Bellevue Avenue. Before approaching Bellevue Avenue the alley widens into a street called Telvada Street. Plaintiff's testimony that during the rainy season he could not get up the alley with his automobile does not establish that with grading the alley would not serve the purpose of entry to a garage erected on the rear of plaintiff's lot. It would seem quite improbable that the alley could not be so improved that it would be ample as a driveway to and from the rear of plaintiff's lot. The council could reasonably consider that as plaintiff's garage was to be constructed at a line within thirty feet from the street line, the approach to the street with an automobile could not be as readily discerned by pedestrians and those passing in the street in vehicles after its erection. Under the circumstances it was for the city council to decide whether the erection of a garage within the thirty-foot limit would be

detrimental to the public welfare. It is for this court to decide whether the question is a debatable one only and the court is not to substitute its judgment for that of the city council if the question of the reasonableness of the ordinance is a debatable one.

We hold that the reasonableness of the ordinance in question here is, to say the least, debatable. It may have been unwise, but it was not necessarily based upon esthetic considerations only, but had a reasonable basis within the charter of the city of Los Angeles and the constitution of the state. The latest expression on the subject by the supreme court of the United States that we have been able to find is contained in the case of *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 [71 L. Ed. 171, 47 Sup. Ct. Rep. 114]. We will quote from page 175: "There is no serious difference of opinion in respect to the validity of laws and regulations fixing the height of buildings within reasonable limits, the character of materials and methods of construction, *and the adjoining area which must be left open,* in order to minimize the danger of fire or collapse, the evils of overcrowding, and the like, and excluding from residential sections offensive trades, industries and structures likely to create nuisances. See *Welch* v. *Swasey*, 214 U. S. 91 [53 L. Ed. 923, 29 Sup. Ct. Rep. 567]; *Hadacheck* v. *Sebastian*, 239 U. S. 394 [Ann. Cas. 1917B, 927, 60 L. Ed. 348, 36 Sup. Ct. Rep. 143]; *Reinman* v. *Little Rock,* 237 U. S. 171 [59 L. Ed. 900, 35 Sup. Ct. Rep. 511]; *Thomas Cusack Co.* v. *Chicago,* 242 U. S. 526, 529, 530 [Ann. Cas. 1917C, 594, L. R. A. 1918A, 136, 61 L. Ed. 472, 475, 37 Sup. Ct. Rep. 190]." (Italics ours.)

We cannot do better than quote further from the case of *Euclid* v. *Ambler Realty Co.* as follows: "Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a

century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning*, but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall.

"The ordinance now under review and all similar laws and regulations must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities. . . . nuisance may be merely a right thing in the wrong place—like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. (*Radice* v. *New York*, 264 U. S. 292, 294 [68 L. Ed. 690, 694, 44 Sup. Ct. Rep. 325].)

"The decisions enumerated in the first group cited above agree that the exclusion of buildings devoted to business, trade, etc., from residential districts, bears a rational relation to the health and safety of the community. Some of the grounds for this conclusion are—promotion of the health and security from injury of children and others by separating dwelling houses from territory devoted to trade and industry; suppression and prevention of disorder; facilitating the extinguishment of fires, and the enforcement of street traffic regulations and other general welfare ordi-

nances; aiding the health and safety of the community by excluding from residential areas the confusion and danger of fire, contagion and disorder which in greater or less degree attach to the location of stores, shops and factories.

" 'If the municipal council deemed any of the reasons which have been suggested, or any other substantial reason, a sufficient reason for adopting the ordinance in question, it is not the province of the courts to take issue with the council. We have nothing to do with the question of the wisdom or good policy of municipal ordinances. If they are not satisfying to a majority of the citizens, their recourse is to the ballot—not the courts.'

"If these reasons, thus summarized, do not demonstrate the wisdom or sound policy in all respects of those restrictions which we have indicated as pertinent to the inquiry, at least, the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."

It was said by the court of appeals of New York, in the case of *Wulfsohn* v. *Burden, Inspector of Buildings of the City of Mount Vernon*, 241 N. Y. 288 [43 A. L. R. 651, 150 N. E. 120] : "The open spaces not only tend to minimize the danger of fire to adjoining buildings and thus a spreading conflagration, but they also afford a greater opportunity for access by fire departments to a burning building and thus increase the possibility of successfully stopping a conflagration before it spreads to other buildings. . . . But certainly it seems to us that a requirement of 25 feet of open space between an apartment house such as the one proposed and adjoining property cannot be said to be an unreasonable protection against some of the dangers to which we have referred."

We are not unmindful of the fact that in *Zahn* v. *Board of Public Works, supra*, at page 502 our supreme court said: "It will not be necessary for us to decide at this time the question as to whether or not the particular set-back ordinance here is valid." But we observe from a careful examination of both the case of *Miller* v. *Board of Public Works, supra, Zahn* v. *Board of Public Works, supra*, and *Euclid* v. *Ambler Realty Co., supra*, that the reasoning used in

each and all of said cases would apply equally to the particular set-back ordinance involved in this appeal. We are not holding that the law laid down in this case, or in any of the cases cited, would affect a case where want of good faith on the part of the legislative body is involved, as there is nothing in this case at bar, or in the three cases cited, raising such a question. We can readily see that circumstances might arise whereby a set-back ordinance of even the distance involved in this case would work an absolute confiscation of an entire lot—but a question of that kind is not involved in this appeal.

We hold that the court erred in granting the writ of mandate. It follows that the judgment of the trial court should be reversed, and it is so ordered.

CONREY, P. J., Concurring.—I concur in the judgment. It is only fair, however, to admit that I have found it difficult to be satisfied with this extension to set-back ordinances, of the rule recently declared in the zoning cases. To say that the owner of a lot, in building thereon, shall leave vacant a thirty-foot strip in front of his property is different in fact, if not in principle, from a mere regulation governing the kind of structure that he may place upon his land. A set-back ordinance, at least in some instances, goes perilously near to depriving the owner of his property without compensation. To wholly deprive one of the use of property is in effect the same as taking the property entirely away from him. On the other hand, of course, it must be conceded that the use is not entirely destroyed, since there remain the rights of light and air and the right of access or passage to and fro across the otherwise unoccupied space. There also remains the right to cultivate the ground and ornament it with grass, trees, and flowers, or, if the owner prefers, with cabbages and turnips, until, perhaps, such right shall be taken away from him for esthetic reasons. A writer, who apparently is neither a judge nor a legislator, has recently remarked concerning Charles I of England: "His theory of the divine right of kings is dead—or at least has been transmuted into a theory of the divine right of legislatures to make police regulations." Even in very recent decisions in some of the states the courts have refused to concede the right to enforce the

establishment of set-back lines by exercise of the police power, and have insisted that such regulations should be enforced under the power of eminent domain, where a right of compensation is recognized. The supreme court of Massachusetts, in making such a ruling, declared that the establishment of such a building line is the creation of an encumbrance upon private property in favor of the public; and that such establishment of a building line being a taking of property by eminent domain, the procedure prescribed for such taking must be followed. (*Inhabitants of the Town of Watertown* v. *Dana et al.*, 255 Mass. 67 [44 A. L. R. 1374, 150 N. E. 860].) If the police power applies to such a case, then the encumbrance always exists in an inchoate state, and is not "created" by the set-back ordinance.

Notwithstanding the foregoing observations, which at least show the difficulty of arriving at a decision in favor of appellants in this case, I concur in the judgment of reversal because I think that such is the inevitable progressive consequence of the decisions rendered in the Miller case and in the Zahn case, which are extensively quoted in the foregoing opinion written by Mr. Justice York. It is admitted by everyone that all private property is held subject to the state's exercise of that vast and flexible authority known as the police power. It may be that some of these later applications of that power, in the control of property rights, present themselves to our minds in the aspect of something arbitrary while they are new, but will seem less objectionable when our independent souls become accustomed to the new bonds. As the individual withers and as his frontiersman spirit is tamed, he will more easily recognize that when he lives in Rome and owns property there he must submit to the conditions which the Romans prescribe. Since it is now established to be the law that the city of Los Angeles, in adopting its zoning plans, may provide for strictly private residential districts, from which all kinds of business structures are prohibited, it is perhaps a very short step, and not crossing any boundary lines of principle, to preserve the commonly accepted characteristics of such residential districts by insisting that every house shall have its own "front yard," with an incidental view across the neighbors' front yards. It may be worth while to observe, however, that the application of this rule may have a direct effect in limiting

the choice of property owners in selecting building plans for homes, so that instead of rear gardens or interior gardens and playgrounds for their children, the trapezes and hobby-horses will have to go out into the more exposed and more public front yard.

It may be, however, that while the enactment of set-back ordinances, as such, is a thing within the power of the municipality, yet that some set-back ordinances might be rejected as unreasonable invasions of private right. In the case at bar, where it appears that the property owner is seeking to erect on the street line a garage for trucks used by him in his trucking business, and to do this in a block of residences, all of which are set back from the street line, it does not seem probable that the application of the ordinance in this case is peculiarly unreasonable.

HOUSER, J., Dissenting.—I dissent. As it is apparent that no consideration of public health, morals, safety, or welfare is here involved, it follows that in my judgment none of the reasons assigned for the exercise of the police power in the premises is sound. I cannot but think that the suggestion that more light, or more air, or more or better fire protection will be afforded in a residence district by reason of the enforcement of a set-back ordinance which forbids the erection of any building nearer than thirty feet to the front property line, is untenable. It may not be doubted that in a downtown business district in a city like New York, for example, where extremely tall buildings are permitted, such an ordinance might be helpful, if not essential, to the public welfare. But on a fairly wide street, in a residence district, the only consideration which can be reasonably urged for the passage of such an ordinance is that without it the beauty of the street will be marred; in other words, the reason is founded solely on esthetical considerations. No one contends but that the police power is elastic; but the upholding of the ordinance in question as legal stretches the police power to the breaking point. The ordinance is arbitrary in its nature, and at least morally discriminatory, if not legally so.

In addition to such criticisms on the exercise of the so-called police power as affecting the ordinance here under consideration, it is clear that the effect of such ordinance is

nothing less than confiscatory. It is possible that a thirty foot corner lot, which may face on a street intersecting at right angles with the street affected by the ordinance in question, so that the length of the lot will run lengthwise of such street, in effect will be taken without compensation and without "due process of law." The owner of such a piece of property, as will the owner of every other piece of property fronting on the street affected by the proposed ordinance (to the extent of thirty feet thereof), will be deprived of practically every useful benefit connected therewith, so far as pecuniary considerations are concerned. That one may be the owner and possessor of real property and yet by ordinance be so restricted as to be prevented from putting it to any beneficial use, presents an anomalous situation. The only remaining privileges to the owner of property so affected are to pay taxes and street assessments levied thereon and keep it cleared of weeds, garbage, and other refuse. In such circumstances, especially as affecting a corner lot fronting on an intersecting street, as hereinbefore suggested, the owner thereof, far from having a property of value, exchangeable for currency or marketable commodity, might even experience difficulty in inducing its acceptance by any person as a gift. To one so situated, if it be possible that the upholding of the ordinance amounts to the safeguarding of his constitutional property rights, by comparison it would seem that the classic myths depict what were stern realities. To my perception, the fact of the matter is that the ordinance is both arbitrary and oppressive and a clear invasion and infringement upon the rights guaranteed by the constitution of this state and of the United States. With the recognition of such legislation as lawful, every other constitutional right possessed by each citizen of the state is in danger of being disregarded at the whim or caprice of any legislative body. As affecting the principle, it was said by Burke:

"The moment you abate anything from the full rights of men each to govern himself, and suffer any artificial positive limitation upon these rights, from that moment the whole organization of government becomes a consideration of convenience."