In the Matter of the Application of HENRY J. VAN AUKEN, Petitioner, for an Order of Mandamus against WALTER B. KIMMEY, as Superintendent of the Bureau of Building of the City of Syracuse; W. W. WIAND, as Commissioner of Public Safety of the City of Syracuse, and ROLLAND B. MARVIN, as Mayor of the City of Syracuse, Respondents.*

Supreme Court, Onondaga County, December 12, 1930.

* See, also, 141 Misc. 117.

*Costello, Cooney & Fearon*, for the petitioner.

*Frank P. Malpass, Corporation Counsel*, for Walter B. Kimmey, as superintendent of the bureau of building; W. W. Wiand, as commissioner of public safety, and Rolland B. Marvin, as mayor of the city of Syracuse.

*Shapero & Markowitz*, for intervening respondents.

SMITH, E. N., J.   The petition is for an order of mandamus, peremptory or alternative, as the court may deem proper, against Rolland B. Marvin, mayor of the city of Syracuse, N. Y.; W. W. Wiand, commissioner of public safety, and Walter B. Kimmey, superintendent of building of said city, commanding them and each of them forthwith to cancel the order of revocation served on the petitioner, dated October 6, 1930, and to permit the alteration of petitioner's premises known as 1423 East Fayette street, in said city, in accordance with the original permit and plans approved by the bureau of buildings of the city of Syracuse on the 16th day of September, 1930, and for such other and further order in the premises as the court may deem just and proper.

Certain owners of various parcels of real estate located in the 1400 block of East Fayette street in said city, to wit, Albert Weinstein, Frank J. Hite, Lena A. Flattery, Harvey H. Bebb and Lillian Smith, have asked permission to intervene in this matter. Their application is granted.

Prior to the 10th day of June, 1925, the petitioner was and now is the owner of premises located at the northwest corner of Maple and East Fayette streets in said city, and had purchased said property for the purpose of erecting thereon a garage and gasoline filling station; there had been erected and maintained thereon a commercial garage and gasoline filling station facing on East Fayette street, the front wall of which is approximately twenty-five feet from the northerly street line of said street; and in front of said garage and at a distance of approximately twelve feet three inches

from said northerly street line of said street the petitioner had erected and has since maintained a concrete base or island some three feet six inches wide by twelve feet long, upon which were erected gasoline pumps; and between the northerly wall of the garage and the northerly street line of said street the petitioner had buried four 1,000-gallon tanks, one of which was between said so-called island and the northerly street line of said street.

Prior to the 10th day of June, 1925, East Fayette street, within the block in which the petitioner was located, had been classified as a local business use zone. On that day the classification was changed from a local business use zone to a B-residential use zone. Prior to said date the petitioner had been using his said property for garage and gasoline purposes, and that part of the property in front of the wall of the garage on said street was used for drive-in purposes, both to said garage and to the said gasoline pump, and has since and until now continued to use said premises for such purposes. Prior to said date there was nothing in the building code or zoning ordinance of the city limiting the use of the petitioner's entire premises for business purposes.

On or about the 29th day of August, 1930, the petitioner applied to the superintendent of building of said city for, and on the 16th day of September, 1930, was granted a permit to make alterations and enlargements to his garage and gasoline station, according to plans approved by said bureau of building. He immediately started upon the making of said alterations and spent sums of money for building material and labor for such purposes, and alleges that thereafter he was notified verbally by the superintendent of building and the commissioner of public safety that there was opposition to such proposed alterations, who suggested that the proposed second story of the garage be not extended out to the street line and that certain changes be made in the plans theretofore approved by said bureau of building; that these suggestions were agreed to by the petitioner. Prior to the 4th of October, 1930, the petitioner filed with said bureau of building a revised plan showing the structural changes to be used. On said 4th of October, 1930, the petitioner was notified by the superintendent of building that he was not "to proceed any further with the erection of a cover over the gasoline tanks at 1423 East Fayette Street until the revised plans are filed and accepted by the Bureau of Building." The petitioner, in response to said notice, proceeded no further with his construction. On the 6th day of October, 1930, the petitioner received from the said superintendent of building a notice that "the permit granted you for remodeling the garage at 1423 East Fayette Street on September 6, 1930, is hereby revoked by

authority given under Chapter 1, Articles 1, 2, 5 Syracuse Building Code."

It appears that the original plans, approved September 16, 1930, were for the building out to the street line from the then existing northerly wall of the garage of an addition to petitioner's garage of such a character that, apart from an office to be erected at the corner of Maple street and East Fayette street, there would be an open but covered space for the accommodation of those driving in to the garage or to get gasoline, while above, another story was to be erected. By the proposed revised plan there was no second story to be erected, but the effect would be of having simply a covered drive-in place, excepting for the office at the corner as above stated. It is apparent that nothing was done officially by the municipal authorities in reference to the proposed revised plan, and the application here is for an order directing the municipal authorities to cancel the above order of revocation, dated October 6, 1930, of the permit of September 16, 1930, so as to leave the petitioner in a position to improve his property according to the original and approved plan. If the permit of September 16, 1930, was issued in violation of the rules governing the bureau of building, it was a nullity, and its revocation was proper.

There is no question here which involves the right of the petitioner to continue in the use of his premises for business purposes to the extent that they were occupied and used for such purposes prior to the time (June 10, 1925) when the character of the district was changed from a local business use zone to a B-residential use zone. The prohibitions of construction within class B-residential zones would prohibit therein the construction and maintenance of a garage or gasoline station for business purposes. The reply of the respondents representing the municipality admits that the petitioner had a vested right in said premises to use them for local business purposes, which was not taken from him by reason of the passage of the ordinance signed June 10, 1925, and that prior to that date there was nothing in the building code or zoning ordinances of the city prohibiting the use of petitioner's entire premises for business purposes.

The reply of said respondents alleges that in the block in question there has been established a so-called "set-back line." It appears that the so-called "building code" of the city, in which is incorporated the zoning rules of the city, contained the following provisions:

Article 5.3.3: "When a Local Business District occupies a frontage of 150 feet or less in an otherwise residential block, the setback lines for the residential district shall be maintained."

Article 5.2.2. defines a set-back line as follows: " The distance from the street line to the part of the structure nearest the street, measured at right angles to the street line, not including cornices, retaining walls and fences."

Article 5.3.2. of said zoning rules, under the classification of " Residential Districts, Class B," after stating that the buildings and structures allowed in class A are permitted in class B, adds certain other structures not permitted in class A-residential districts, and contains this provision: " subject, however, to the same restrictions and conditions contained in Article 5.3.1., except that the setback line where not established by existing buildings may be not less than ten feet in B-Residential Districts."

Article 5.3.1., governing the restrictions in class A-residential districts, contains the following provision: " Provided that *where there are already buildings erected in a block*, the building line for the new buildings shall be determined by an average established between the building lines of the nearest buildings in the block within 200' in both directions, except that in no case shall a building be required to set back further than 45 feet, (measurement to be taken from the street or property line to any part of the structure including porches, etc.)

" Provided further that where there is no such setback line so established by existing buildings the setback line shall not be less than 20 feet from the street line in A-Residential Districts."

The municipality has done two things: (1) It has established a zoning ordinance. (2) In the zoning ordinance it has provided for set-back lines. The power to do either of these acts must be found either in the general statutes affecting cities or in special legislative acts affecting the city of Syracuse alone.

Subdivision 24 of section 20 of the General City Law (added by Laws of 1913, chap. 483, as amd. by Laws of 1925, chap. 394) is the only legislative base for the establishment of so-called " set-back lines." This was in effect at the time of the adoption of the zoning ordinance by the city of Syracuse June 10, 1925, and reads as follows: " To regulate and limit the height and bulk of buildings hereafter erected, to regulate and determine the area of yards, courts and other open spaces, and to regulate the density of population in any given area, and for said purposes to divide the city into districts. Such regulations shall be uniform for each class of buildings throughout any district, but the regulations in one or more districts may differ from those in other districts. Such regulations shall be designed to secure *safety from fire and other dangers and to promote the public health and welfare, including, so far as conditions may permit, provision for adequate light, air* and convenience of access, and *shall*

*be made with reasonable regard to the character of buildings erected in each district, the value of land and the use to which it may be put, to the end that such regulations may promote public health, safety and welfare and the most desirable use for which the land of each district may be adapted and may tend to conserve the value of buildings and enhance the value of land throughout the city."*

The general authority to a city to provide for zoning is to be found in said section 20, subdivision 25 (added by Laws of 1917, chap. 483), which reads as follows: "To regulate and restrict the location of trades and industries and the location of buildings, designed for specified uses, and for said purposes to divide the city into districts and to prescribe for each such district the trades and industries that shall be excluded or subjected to special regulation and the uses for which buildings may not be erected or altered. *Such regulations shall be designed to promote the public health, safety and general welfare and shall be made with reasonable consideration, among other things, to the character of the district, its peculiar suitability for particular uses, the conservation of property values and the direction of building development, in accord with a well considered plan."*

These provisions, substantially as they now exist, were added to the General City Law by chapter 483 of the Laws of 1917. So that at the time of the adoption of the special act applicable to the city of Syracuse (chapter 447 of the Laws of 1920, entitled "An Act to provide a city planning commission in and for the city of Syracuse") such city possessed the powers and still possesses the powers enumerated in said subdivisions 24 and 25 of section 20 of the General City Law. Chapter 447 of the Laws of 1920 provided for the creation of a city planning commission, for the expenses thereof, and granted to it certain powers. This act was amended by chapter 544 of the Laws of 1922, and also by chapter 134 of the Laws of 1923, and, as so amended and as in effect during the times involved in this proceeding, reads as follows:

"6. The commission shall have the power, by and with the consent by ordinance of the common council, to divide the city into districts and to regulate, restrict and prohibit the location of businesses, trades and industries, and the location, alteration and occupation of buildings or structures designed for specified uses or of a certain character or class in any such district, also to prescribe for each such district the trades, businesses and industries that shall be permitted, excluded or subjected to special regulations and uses for which buildings and structures may or may not be erected, altered, used or occupied. The use or occupation of a building or structure shall not be changed or altered so as to be in violation of the rules, regulations, restraint or prohibition applying to such

district. A portion of a street may form or be a part of any such district. Residence districts may be created in which shall be permitted only single family dwelling houses or residences containing accommodations for such number of families as may be deemed proper. Specified businesses may be included in one district and others excluded therefrom and special regulations may be prescribed for the businesses, trades, or industries in such district. Regulations, restrictions and prohibitions in one or more districts may differ from those of other districts. *Such regulations, restrictions and prohibitions shall be designed to promote the health of the public, the safety and welfare of the inhabitants of the city,* the promotion of the growth and prosperity of the city and to secure the proper development and upbuilding of the city. Such regulations, restrictions and prohibitions may from time to time be amended, modified, altered or annulled by resolution of the commission and ordinance of the common council. The ' zoning rules and regulations for the city of Syracuse ' heretofore adopted by the city planning commission and approved and adopted by ordinance of the common council and now in force and effect in the city and the same as amended, modified, altered or annulled from time to time, including all specific penalties fixed for the violation of any provisions thereof shall be binding in the city and have the full force and effect of statute."

It will be noted that there is no authority conferred upon the muncipality by this act to make any provision whatsoever in reference to so-called " set-back lines," and such authority, if any exists, must be found in the provisions of subdivision 24 of section 20 of the General City Law, above quoted. The establishment of set-back lines is an act separate and distinct from so-called " zoning," and the power to establish districts in which businesses of a certain character may be conducted, or in which only certain classes of buildings may be erected, does not include the power to establish set-back lines. Under the so-called " zoning law " or any regulations adopted by a municipality thereunder, the only authority a municipality acquires is to district the municipality and to establish the character of businesses or the character of structures which shall be maintained within a district.

These questions then arise: (1) Has a municipal corporation any authority to establish set-back lines under and pursuant to the provisions of subdivision 24 of section 20 of the General City Law? (2) Has the city of Syracuse done any act to establish a set-back line in respect of East Fayette street within the 1400 block?

In *Matter of Wulfsohn* v. *Burden* (241 N. Y. 288) an order refusing an order of peremptory mandamus against the respondent (the inspector of buildings of the city of Mount Vernon) was affirmed.

The petitioner sought a permit to construct a large apartment house upon a parcel of land which was located partly in an A-residential district and partly in a B-residential district under the zoning ordinance of said city. The building code of said city provided that in the use of a lot in an A-residential district for an apartment house or a hotel the height should not exceed five stories and that there must be a set back from each lot and street line of fifty feet, and in a B-residential district of twenty-five feet. In that case an order of peremptory mandamus was refused on the ground that the court was unable to hold as a matter of law that the regulations were so arbitrary and unreasonable as to be invalid, and it was held that in order to succeed the petitioner would have to show not only "that a set-back of 50 feet on a large apartment house such as he proposes to erect is arbitrary and unreasonable, but he must go farther and establish that a set-back even of 25 feet is invalid because of its arbitrary and unreasonable character," and then intimated: "it seems to us that a requirement of 25 feet of open space between an apartment house such as the one proposed and adjoining property cannot be said to be unreasonable protection against some of the dangers to which we have referred." (Such as fire.) This, so far as has been brought to my attention, is the only case in which the subject of set-back lines established by law or ordinance has been considered in this State.

Ordinarily, provisions for set-back lines are contained in deeds and are known as "building lines." With the growth of cities and the concentration of populations and of buildings, questions of air, light, fire protection and traffic conditions become important and of course form a basis of restrictions on the ground of public health and safety, particularly in reference to the height of buildings and to their location in relation to the street line. The limitations upon the use of one's land, not in respect of the character of the use but of the occupation of part of it at all for a lawful purpose, constitutes a much greater limitation than a limitation which is arrived at by a reasonable zoning ordinance which determines merely the character of the occupancy within a prescribed district. The right to establish set-back lines in effect deprives one of the right to use property at all for the purpose of construction thereupon, and constitutes such a violation of the principles of the common law in reference to property that only upon the highest grounds of public health and safety and welfare can regulations establishing set-back lines be justified; and then only by provisions which give ample opportunity for hearing on the part of a party aggrieved.

It is obvious that there has never been any establishment of

a set-back line on East Fayette street in particular. The respond-ents city officials in their reply state: "That in the block on East Fayette Street in which is included the property of the petitioner there has been established a set-back line *by existing buildings which have been in existence for a long time prior to September 1930 and that said set-back line so established by buildings so existing prior to 1930 is located about 16.83 feet from the street line;* that the building constructed by the petitioner during the year 1925 on the premises of said petitioner consists of a brick automobile garage and that said automobile garage building is located on said premises a distance in from the street line of said property of about 25.2 feet." It is evident that the provision of the zoning ordinance in reference to the location of set-back lines by the average of the set-backs of existing buildings in a block is not dictated by any consideration of either public safety, public health or general welfare; and this from the fact that such a method does not establish a general rule of distance, but rather a variable measure, having no relation to width of a street or surrounding conditions; nor is the set-back line anywhere established so that any one would know where in any particular place the set-back line might be; the "set-back line" in one block would vary from that in an adjoining block on the same street; nor has there been any opportunity for any one to be heard in reference to the establishment of a set-back line in any particular locality. In this instance it is alleged that the average distance of the buildings within the block in question establishes a set-back line of 16.83 feet. This line might be varied from time to time by the destruction of property by fire, and would change with the construction of every new building; it might be one distance one month and another distance another. So this provision of the zoning rules fails to establish a set-back line. The attempt to enforce such a provision would, on its face, be unreasonable and arbitrary.

Can the same be said as to the provision in reference to class A-residential districts, that "where there is no set-back line so established by existing buildings the setback line shall not be less than 20 feet from the street line," and in reference to class B-residential districts "that the setback line where not established by existing buildings may be not less than ten feet."

These two provisions have no application to the question here involved, but do apply to properties where set-back lines are not established by existing buildings, or where there are no buildings at all. So that question need not here be considered, and would only arise where one might seek to erect a building on a street

in a block where there was no set-back line established in the manner above noted.

The provision of article 5.3.3 which reads "When a Local Business District occupies a frontage of 150 feet or less in an otherwise residential block, the setback lines for the residential district shall be maintained," can have no application to the present situation for the reason that in this case the whole block, not a part of it, is set apart as a class B-residential district.

I am, therefore, of the opinion that the city authorities were in no position to refuse to cancel the revocation of the permit already granted on the ground that to do so would constitute a violation of the rules in reference to set-back lines; and if this were all, an order of peremptory mandamus should issue.

It remains to be considered whether or not, where a property has been used in part for business purposes prior to the establishment of the block in which it is located as a B-residential district, the structures may be enlarged after the establishment of the residential district so as to occupy more of the land for a then prohibited business purpose than was occupied by the original structure.

There are no provisions in the zoning ordinance which specifically limit the right to enlarge a building already existing and used for a prohibited purpose at the time of the establishment of a change in the character of the district in which the property is situated. The only provisions pertaining to the subject are as follows:

"Article 5.4.2. Existing Buildings. Nothing in these rules, regulations, restrictions or prohibitions shall be construed as changing the plans, or uses of present buildings, or the construction, use or occupation of any building for which a permit has heretofore been issued according to law, and the construction of such building has been diligently prosecuted within three months after the date of such permit."

"Article 5.4.3. Damaged Buildings. Whenever a building or structure not now conforming to the rules * * * herein contained shall be partially destroyed, or removed on account of fire or accident, or because it has been condemned by reason of being unsafe, such building or structure may be restored and thereafter used and occupied as formerly."

"Article 5.4.4. Change of Occupancy. Any buildings or structures now legally existing and used in any of said zones, and not conforming to the rules * * * herein contained, may be continued and used for such purposes as they are now used, or for any other purpose classified by the Planning, Parks and Recreation Commission, with the approval of the Common Council as

not more objectionable than the purpose for which they are now used, and such buildings or structures may be altered, repaired or remodeled for such purposes."

The fact that the premises of the petitioner were at the time of the classification of the block in which they are located as a B-residential district used for a purpose prohibited within such a district, coupled with the foregoing quoted provisions in reference to uses and reconstruction, would seem to lead to the inference that enlargements of existing buildings for prohibited uses are prohibited. (*People ex rel. Ventres* v. *Walsh*, 121 Misc. 494.)

Whether such a prohibition as applied to the property of the petitioner works upon him an undue hardship, or is as to him arbitrary and unreasonable, raises questions of fact which cannot be determined upon the papers submitted. What the reason was for the revocation of a permit to enlarge, and whether it is warranted as a proper exercise of police power on the basis of public safety, health or welfare, cannot be here determined peremptorily. Suffice it to say, in passing, that if the only purpose was an æsthetic one, as, for instance, for the purpose of preserving the vista of adjoining property owners, this would not be a purpose which would form a basis for the exercise of police power. (*Matter of Isenbarth* v. *Bartnett*, 206 App. Div. 546; affd., without opinion, 237 N. Y. 617.) To properly pass upon this question requires the determination of questions of fact which are not before the court on this application for a peremptory order of mandamus.

This court has called attention to the fact that the city of Syracuse has failed as yet to establish a board of appeals under the authority which it has, with the result that there will be recurring applications to the court in reference to questions which could be ironed out under the well-established authority which such a board of appeals could exercise in reference to building and zoning ordinances.

A writer upon the subject of the constitutionality of zoning says what I think is here pertinent: " In the early days of zoning a board of appeals was considered a device merely for rounding off the sharp corners of the zoning requirements. Such a board is now considered absolutely necessary to the safe operation of a zoning ordinance. It is the safety valve of the zoning plan. A zoning ordinance, like a steam boiler, will sooner or later blow up if there is no safety valve. Where there is a functioning board of appeals to which every aggrieved applicant for a permit may resort, litigation automatically assumes the form of a court review of the discretion of the board, instead of out and out attacks on the constitutionality of specific instances of regulation. * * *

Where there is no board of appeals, instances are sure to arise which the courts must under the law declare unreasonable and arbitrary and, therefore, void."

With a properly constituted board of appeals, the questions here presented could have been ironed out and a solution reached which, if undue hardship existed, would tend to relieve the extremes thereof.

Zoning ordinances are not intended to be and cannot long continue to be mere straitjackets to be applied and held rigid by purely bureaucratic authority. The letter of the ordinance must yield, in instances of extreme hardship, and according to conditions of irrepressible growth and development. Properly administered, zoning ordinances do not destroy but add to values; arbitrarily administered or adopted, without regard to the proper limits of police power, they become instruments of hardship and of tyranny which can only be relieved by multitudinous applications to the court. The final determination of the proper application of the rules as adopted ought not to be left to the final determination of an administrative officer, but a citizen aggrieved should have opportunity to appeal to a quasi-judicial body with power to view and study the situation, whose determination, in the absence of bad faith or abuse of discretion, would rarely be disturbed upon review by a court.

In view of the circumstances, the application for an order of peremptory mandamus must be denied, for the reason that the facts necessary to determine whether mandamus should issue are not sufficiently before the court. The petitioner in this event asks for an alternative mandamus order.

The papers submitted upon the application consist of the petition, the answer of the respondents, the petitioner's reply to such answer, and the reply of the respondents to such reply.

The petitioner alleges that the statutes of the State of New York, the provisions of the charter of the city of Syracuse providing for the city planning commission, the action taken by the city planning commission on June 10, 1925, as aforesaid, the action of the common council of the city of Syracuse on or about April 23, 1930, and the adopting of the building code for the city of Syracuse, are invalid and ineffective as against the petitioner and in violation of section 6 of article 1 of the Constitution of the State of New York and/or of the Fifth and Fourteenth Amendments to the Constitution of the United States, in that in their operation they deprive the petitioner of his property without due process of law.

There are other allegations in respect to questions of constitutional law involved, but the foregoing are sufficient to show that the petitioner has raised questions of constitutional right.

He further alleges that the building code and zoning ordinance were not legally adopted.

It is too late now to question generally the constitutionality of properly adopted zoning ordinances. While in general the ordinances may be constitutional and a proper exercise of municipal power, yet they may in their application to a particular situation be arbitrary and unreasonable and work an undue hardship to an individual, to such an extent that they may be, in their application to a particular situation, not within the police powers of the municipality, and may operate to deprive a citizen of constitutional rights in respect to the use and occupancy of his property. Whether this is true or not depends upon questions of fact applicable to a particular situation.

While I feel that an order of peremptory mandamus cannot issue, I think the situation is such that an alternative mandamus order should issue, to the end that the facts may be fully presented; and, with all the facts and circumstances before the court, it may be in position to pass upon the questions raised in the papers submitted on this application.

Let an alternative mandamus order issue, the form of which may be agreed upon by the parties, and, if not agreed upon, may be settled upon two days' notice.

Ordered accordingly.