[L. A. No. 20873. In Bank. Sept. 28, 1950.]

CHARLES L. CLEMONS, Appellant, v. CITY OF LOS ANGELES et al., Respondents.

E. H. Delorey and Harold L. Newman for Appellant.

O'Melveny & Myers, Louis W. Myers, W. B. Carman, Jr., Sidney H. Wall and William W. Alsup, as Amici Curiae on behalf of Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones, Roger Arnebergh, Assistant City Attorneys, Lester L. Lev and Alan G. Campbell, Deputy City Attorneys, for Respondents.

SPENCE, J.—This action for declaratory and injunctive relief was brought to test the validity of an ordinance of the city of Los Angeles limiting the subdivision of property to certain minimum lot requirements. The trial court held that the ordinance was "constitutional, valid and enforceable," and that certain transactions concluded by plaintiff in violation thereof were "null and void." The propriety of such adjudication cannot be successfully assailed in the light of settled legal principles.

It appears from the agreed statement of facts that within two years prior to the commencement of this action on December 12, 1946, plaintiff purchased the property in question, a bungalow court of nine units which had been built some 20 years previously and had been used continuously for residential purposes. Located in zone C-2 on Beverly Boulevard, the property was subject to section 12.21-C of the Los Angeles Municipal Code (Ordinance No. 77,000 adopted September 28, 1936, as amended by Ordinance No. 90,500, adopted March 7, 1946) providing that no lot "held under separate ownership" at the law's effective date and "used . . . for dwelling purposes" shall be "reduced in any manner below the minimum lot area, size or dimensions" prescribed—"a minimum average width of fifty (50) feet and a minimum area of five thousand (5000) square feet."

Following his purchase, plaintiff subdivided the property into nine separate parcels, each averaging 925 square feet (25'x37') and having a bungalow thereon. Through sale or 99-year lease arrangements plaintiff conveyed eight of these parcels to various individuals—transactions contrary to the minimum lot area and width requirements of the ordinance as a zoning regulation. Each parcel was conveyed with an easement to Beverly Boulevard over the walkways within the bungalow court. Two of the parcels had no frontage on any street or alley. The entire property was serviced by only one incinerator and two sewer connections.

Threatened with arrest and prosecution for violation of the

ordinance, plaintiff instituted this action for declaratory and injunctive relief from the enforcement of such municipal regulation against him as a property owner, charging that it transcended the legitimate scope of the exercise of the police power and constituted "an unwarranted and arbitrary interference with [his] constitutional rights." Several persons intervened in this action, among whom were Joseph Girofilo and Blanche M. Girofilo, who filed a "cross-complaint in intervention." The trial court upheld the validity of the ordinance both in its general aspects and in its application to plaintiff's property, and declared that certain transactions made contrary thereto were "null and void." Plaintiff has appealed from the adverse judgment accordingly entered and also from the court's order denying his motion for a new trial. Since said order is not appealable (Code Civ. Proc., § 963; *Pipoly* v. *Benson,* 20 Cal.2d 366, 368 [125 P.2d 482, 147 A.L.R. 515]), plaintiff's purported appeal therefrom must be dismissed and only the appeal from the judgment remains for consideration.

■ The constitutionality of the principle of zoning is no longer an open question, and a restrictive regulation in this field pursuant to a municipality's comprehensive and systematic plan of community development, when reasonable in object and not arbitrary in operation, will be sustained as within the legitimate exercise of the police power. (*Miller* v. *Board of Public Works,* 195 Cal. 477, 488-490 [234 P. 381, 38 A.L.R. 1479]; *Zahn* v. *Board of Public Works,* 195 Cal. 497, 503 [234 P. 388], affirmed 274 U.S. 325, 328 [47 S. Ct. 594, 71 L.Ed. 1074]; *Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 337 [175 P.2d 542].) ■ Such an enactment is considered with every intendment in favor of its validity, and a court will not, except in a clear case of oppressive and arbitrary limitation, interfere with the legislative discretion which has been exercised in the adoption of the regulation. (*Jardine* v. *City of Pasadena,* 199 Cal. 64, 72 [248 P. 225, 48 A.L.R. 509].) ■ It is presumed that the measure as a whole is justified under the police power and adapted to promote the public health, safety, morals, and general welfare. (*Lockard* v. *City of Los Angeles,* 33 Cal.2d 453, 460 [202 P.2d 38, 7 A.L.R.2d 990].) The courts may differ with the zoning authorities as to the "necessity or propriety of an enactment," but so long as it remains a "question upon which reasonable minds might differ," there will be no judicial interference with the municipality's determination of policy. (*Miller* v. *Board of*

*Public Works, supra,* p. 490; see, also, *Acker* v. *Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455].) The mere fact that some hardship may be experienced is not material, for "[e]very exercise of the police power is apt to affect adversely the property interest of somebody." (*Zahn* v. *Board of Public Works, supra,* p. 512.) Consonant with these established principles, the zoning ordinance here involved is not vulnerable to plaintiff's attack.

Zoning is an essential part of a city's overall master plan for community development (Planning Act of 1929, Stats. 1929, p. 1805, as amended; 2 Deering's Gen. Laws, Act 5211b later superseded by Conservation and Planning Act, Stats. 1947, ch. 807, p. 1909, as amended; 2 Deering's Gen. Laws, Act 5211c), and a city is vested with control of "the design and improvement of subdivision," subject to judicial review as to reasonableness. (Subdivision Map Act, Stats. 1937, p. 1864, as amended, now Bus. & Prof. Code, §§ 11500 et seq.; § 11525.) The word "design" is defined in the latter act to include, among other things, provision for "minimum lot area and width" (Bus. & Prof. Code, § 11510) by "local ordinance." (Ibid, §§ 11506, 11526.) Consistent with this state recognition of municipal functions and in line with its autonomous character (Cal. Const., art. XI, § 6; *West Coast Advertising Co.* v. *San Francisco,* 14 Cal.2d 516, 519-521 [95 P.2d 138]), the city of Los Angeles adopted the zoning ordinance prohibiting the reduction of residential lots below the specified minimum of 5,000 square feet in area and 50-foot frontage. The city's charter expressly contemplates the adoption of regulations pursuant to the authority granted by the Subdivision Map Act (charter, § 95(g)), and on this point the trial court found that the ordinance ". . . constitutes an essential part of the master plan for the comprehensive development of the City of Los Angeles in that it is designed to prevent the cutting up of lots into unduly small areas and into parcels of economically unusable widths; that the ordinance . . . supplements the California Subdivision Map Act in that it prevents lots sold pursuant to said Act from being further subdivided, and in so doing, the ordinance prevents or diminishes the possibility of circumvention of [said] Act." In support of its view that the "ordinance is an important factor in the orderly development of the city," the trial court found that the "attempted cutting up" of such property as plaintiff's bungalow court would "tend to create and accelerate the creation of slum

conditions" and "overcrowd[ing]," thus "militating against orderly, quiet and peaceful living"; that "health and sanitary regulations and laws would be more difficult to enforce" if the bungalow units "were sold to various separate owners"; and that therefore "said ordinance has a reasonable relation to the public health, safety and general welfare, and was enacted for the public good."

■ Where from a consideration of the evidence the trial court has found certain physical facts and conditions to exist in relation to the particular property restriction involved as would justify regulation by the city through the exercise of its police power, all intendments must be indulged to sustain such findings and the resulting judgment. (*Ayres* v. *City of Los Angeles*, 34 Cal.2d 31, 39 [207 P.2d 1].) So significant are these factors in accord with the objectives found by the trial court to be within the design of the ordinance.

■ The benefits of the Subdivision Map Act would be of little practical value in aid of desirable community planning if following the subdivider's compliance for the terms of the initial sale, the purchasers of the lots could erect multiple dwellings thereon according to authorized specifications and then "cut up" the units for separate sale. In this regard the ordinance clearly appears to supplement the state act and to operate in avoidance of its circumvention as the trial court found. Likewise appropriate for consideration here is the memorandum opinion filed by the trial judge and included in the record (Rules on Appeal, rule 5(a), 22 Cal.2d 1, 4) as bearing on the interpretation of the findings. (*Trans-Oceanic Oil Corp.* v. *Santa Barbara*, 85 Cal.App.2d 776, 790 [194 P.2d 148].) The comment is there made that according to the view of experts in the field of community development, the subdivision of "bungalow courts into separate parcels" tends "to create slum conditions" because it would be unlikely that a uniform state of repair would be maintained by the various owners and a "hodge-podge appearance" would result, with a consequent depreciation in value of the entire property; "overcrowding" develops because where it is "a common practice for landlords to limit the number of people who may occupy a bungalow in a court," such restriction would not apply under separate ownership of the various units, and the probable increase and concentration of people within the limited area would "add to the noise and other irritations that militate against orderly, quiet and peaceful living"; "health and sanitary regulations" become "more difficult

to provide for and enforce," and particularly where such "close living" in separately owned bungalow units contemplates "each person . . . constantly making use of easements over the others' property, and where there is no one to make or enforce any rules touching items of common necessity to all, such as, for example, use of incinerators or other disposal of trash, and keeping clean the common walkways," the situation could create disturbing tensions. As is further there said, the "City Council may well have had all these matters in mind in passing the ordinance here under attack and may have concluded that it was necessary in furtherance of the general welfare of the city and its orderly development."

A zoning law which prescribed a minimum area of one acre for residential lots was recently upheld in *Simon* v. *Town of Needham*, 311 Mass. 560 [42 N.E.2d 516, 141 A.L.R. 688], as a reasonable and valid restriction in view of the location of the district, the physical characteristics, and other circumstances present. Among the factors considered pertinent in relation to the municipality's power to so regulate the size of house lots in a district which appeared "admirably suited for one family residences" were the following (p. 518 [42 N.E. 2d]): avoidance of "congestion in the streets"; prevention of "overcrowding of land"; facilitation in furnishing "transportation, water, light, sewer and other public necessities"; provision of recreational space for "children to play"; encouragement of the "cultivation of flowers, shrubs and vegetables." While the court recognized that there might be a "difference of opinion" as to the real advantages that would accrue from the larger lots and whether they were such as to lead one to the conclusion that the adoption of the one-acre area would result in a "real and genuine enhancement of the public interests," still a belief that such a result would be realized under the particular circumstances was "not unreasonable" and precluded "the measure" from being held "invalid." (P. 518 [42 N.E.2d].) Similar factual considerations prevailed and a like rationale was followed in the case of *Greenway Homes* v. *Borough of River Edge*, 137 N.J.L. 453 [60 A.2d 811], with regard to a zoning regulation prescribing a minimum frontage of 75 feet in residential districts.

While the validity of the respective zoning laws in these two cited cases arose in connection with the power of the municipality to disapprove map plans for proposed subdivisions and to deny permits for the erection of dwellings

thereon unless the minimum lot requirements were observed, such difference in the stage of development of the land at the time of litigation as compared with the present case does not militate against the principle of decision sustaining the propriety of such type of regulation. So here the factors listed by the trial court as constituting a basis for the adoption of the ordinance in question appear to bear a reasonable relation to the public interests—the general welfare of the community —and properly bring the regulation within the purview of the police power. (*Thille* v. *Board of Public Works,* 82 Cal.App. 187, 190-193 [255 P. 294].)

 Plaintiff argues that the zoning ordinance prohibiting his conveyance of the bungalow units in separate parcels to individuals as he chooses encroaches upon constitutional guarantees attaching to the ownership of property and securing him in his right to contract concerning the use, enjoyment, and disposition of his property. (U.S. Const., Fourteenth Amend., § 1; Cal. Const., art. I, §§ 1, 13, and 14.) But the fact that the ordinance so restricts plaintiff in his right to dispose of his property is not determinative of its invalidity, for in innumerable situations the sale of various types of property has been subject to regulation by public authority: such as drugs (*Gregory* v. *Hecke,* 73 Cal.App. 268 [238 P. 787]), various food products (*Justesen's Food Stores, Inc.* v. *City of Tulare,* 43 Cal.App.2d 616 [111 P.2d 424]), second-hand and pawned merchandise (*In re Holmes,* 187 Cal. 640 [203 P. 398]); the quantity of farm produce that may be marketed (*Agricultural Prorate Com.* v. *Superior Court,* 5 Cal.2d 550 [55 P.2d 495]); and articles at auction (*Hart* v. *City of Beverly Hills,* 11 Cal.2d 343 [79 P.2d 1080]). The right of free bargaining does not preclude legislation directed toward the curbing of predatory merchandizing practices which tend to injure or destroy fair and open competition. (*Wholesale Tobacco Dealers Bureau* v. *National Candy & T. Co.,* 11 Cal. 2d 634 [82 P.2d 3, 118 A.L.R. 486].) A property owner may not divide his tract of land into lots to sell before developing or improving them without complying with the Subdivision Map Act. (*Cowell* v. *Clark,* 37 Cal.App.2d 255 [99 P.2d 594].) These various instances illustrate the expanding concept of the exercise of the police power consistent with "the gradual regulation of the individual in his liberty of action and ownership of property for the public good." (*Max Factor & Co.* v. *Kunsman,* 5 Cal.2d 446, 458 [55 P.2d 177]; see, also, *Miller* v. *Board of Public Works, supra,* 195 Cal. 477, 484.) Likewise

here the zoning ordinance as above considered in relation to the city's accomplishment of a comprehensive and systematic plan of community development shows the challenged regulation to have been reasonably adopted in furtherance of the "general welfare," and plaintiff's individual liberty in the disposition of his property may be curtailed to that extent in the public interest. Moreover, it should be noted that plaintiff still has the right to sell the property as he bought it—the bungalow court as a single entity—and he has only been deprived of his right to "cut it up" into individual units for conveyance to separate individuals, to what reasonably appears would be to the public detriment and at variance with the dictates of the city's overall plan of community design.

Plaintiff further argues that the zoning ordinance is unreasonable and arbitrary in its application to his property because his subdivision and separate conveyance of the bungalow units to various individuals would effect only a change in ownership, and not a change in their use for dwelling purposes. In this connection reliance is placed on these factors: that the bungalow units were constructed on plaintiff's property some 20 years before the adoption of the ordinance in question; that the city laws do not purport to require the removal of these improvements nor cessation of the present use thereof; that the property would remain exactly as it has been in the past, without a change in its improvements, its use or its existing yard areas, and the sole difference would be the circumstance of single ownership of the bungalow units through the respective conveyances; and that the city manifestly does not consider such bungalow courts as a nuisance, for the very ordinance here considered permits the present construction of just such improvements on 5,000-square-foot lots held under single ownership in the C-2 zone (where plaintiff's property is situated), with a requirement of only 800 square feet of lot area per dwelling unit—while each of the parcels into which plaintiff has subdivided his property contains approximately 925 square feet. But the mere fact that the property in its existing condition is not deemed a nuisance *per se* nor objectionable as a "near-nuisance" in constituting a menace to health, safety or morals in the strict sense of the phrase does not strengthen plaintiff's position. (*Jones* v. *City of Los Angeles*, 211 Cal. 304, 310 [295 P. 14].) The "police power as evidenced in zoning ordinances has a much wider scope than the mere suppression of the offensive

uses of property . . . it acts not only negatively but constructively and affirmatively for the promotion of the public welfare.'' (*Miller* v. *Board of Public Works, supra,* 195 Cal. 477, 487-488.)

The ordinance here challenged is grounded in considerations of the ''general welfare'' pursuant to the city's comprehensive and systematic plan of community development, and consistent with the ''tendency to a more liberal construction of the police power, as applied in zoning and other regulatory laws'' (*Thille* v. *Board of Public Works, supra,* 82 Cal.App. 187, 189), plaintiff's right to the unlimited and uncontrolled disposition of his property may properly be subordinated to the public good. (*Miller* v. *Board of Public Works, supra; Zahn* v. *Board of Public Works, supra,* 195 Cal. 497.) The various factors above reviewed as found by the trial court to be possible motivating forces in the city's adoption of the ordinance show it to have a reasonable relation to the interests of the community as a whole in establishing a recommended residential pattern through regulation of minimum lot areas under single ownership. Moreover, it is fairly arguable that numerous other advantages might well suggest themselves when one attempts to visualize the appearance of a sizable area of a city subdivided into lots akin in dimension to those of plaintiff, upon each of which there stood an individually owned and maintained dwelling—in support of the legislative discretion exercised in the enactment of this regulation. (See *Simon* v. *Town of Needham, supra,* 311 Mass. 560 [42 N.E.2d 516, 518].) The zoning ordinance is not objectionable upon retroactive grounds in destroying plaintiff's vested property rights (*Jones* v. *City of Los Angeles, supra,* 211 Cal. 304, 310-311), but it only looks to the future in guiding a pattern of home development in the enhancement of the public interest. (*Acker* v. *Baldwin, supra,* 18 Cal.2d 341, 346.) While it may be that plaintiff could realize a greater profit in the aggregate from the disposition of the various bungalows in single units to different individuals, such consideration does not make the zoning ordinance arbitrary in its application to his property (*Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d 332, 338; *Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d 453, 466-467) nor preclude the regulation of his individual rights in the promotion of the general welfare. (*Miller* v. *Board of Public Works, supra,* 195 Cal. 477, 487-488.)

██ There remains for discussion the further contention —a matter vigorously argued on behalf of plaintiff by amicus

curiae, the California Land Title Association—that the trial court erred in declaring void certain transactions of plaintiff in violation of the ordinance. The principal attack is directed at paragraph 2 of the judgment, which reads: ". . . the purported sales made by plaintiff and referred to in the amended complaint and in the findings of fact were made in violation of said Section 12.21C of the Los Angeles Municipal Code and are null and void." It is argued: (1) that the city had no power to enact legislation which would render void any transfer of title to real property; and (2) that even assuming the existence of such power, the ordinance should not be construed as having that effect.

We may assume, without deciding, that ordinarily a city has no power to legislate concerning the validity of transfers of title to real property, for it has been said: "The state has full control over the subject of the mode of transferring and establishing titles to property within its limits." (*Robinson v. Kerrigan*, 151 Cal. 40, 46 [90 P. 129, 121 Am.St.Rep. 90, 12 Ann.Cas. 829].) In this connection it may be observed that the ordinary municipal zoning ordinance is concerned only with the regulation of the use of land as distinguished from the ownership thereof. But in the present case, the state legislation embraced in the Subdivision Map Act (Stats. 1937, p. 1864, as amended, now Bus. & Prof. Code, §§ 11500 et seq.) dealt with the subject of transfers of ownership and the validity of transfers made in violation of its terms (Bus. & Prof. Code, § 11540), and it expressly empowered the cities to supplement that act in the manner provided by the section of the ordinance under attack. (Bus. & Prof. Code, §§ 11510, 11525.) The only reasonable conclusion to be drawn from a reading of the state act and the municipal ordinance is that the state intended by its legislation to empower the cities to impose the same civil sanctions for violations of supplementary municipal ordinances as those found in the Subdivision Map Act, and that the city here intended, by the enactment of its ordinance, to exercise the power so conferred. Under these circumstances, it is immaterial that the ordinance did not expressly declare the title consequences of a violation of the terms of said section 12.21-C. (*Smith v. Bach*, 183 Cal. 259, 262-264 [191 P. 14].) We conclude that plaintiff's transactions in violation of the ordinance were not void *ab initio* but were voidable at the option of the other parties to said transactions as provided in the state act. (Bus. & Prof. Code, § 11540.)

This conclusion is in line with the argument of counsel for plaintiff and counsel for amicus curiae as found in their joint petition for rehearing herein. It is there said: "Even if the city had power to affect land titles, the ordinance should be construed as attaching to a conveyance violative of its terms the same voidable character as is provided by the Subdivision Map Act for conveyances made in violation thereof . . . We submit that such a construction would be entirely permissible in view of the apparent fact that the ordinance was enacted pursuant to the authority granted by the Subdivision Map Act and for the purpose of supplementing its provisions." In passing, it should be noted that this litigation arose prior to the addition in 1949 of section 11540.1 of the Business and Professions Code. (Stats. 1949, ch. 1100, p. 2001.)

▮ Having concluded that plaintiff's transactions in violation of the ordinance were not void but were voidable as provided in the Subdivision Map Act (now Bus. & Prof. Code, § 11540), we turn to a consideration of the disposition to be made of the judgment from which the appeal is taken in the light of the record before us. The short record in the form of an agreed statement contains, among other things, the findings, judgment, notice of appeal, and written opinion of the trial judge but does not include any of the pleadings, reference to which pleadings is made in the findings. From the judgment and notice of appeal, it appears that there were numerous interveners, who were represented by separate counsel, in addition to Joseph Girofilo and Blanche M. Girofilo, who were designated as "cross-complainants in intervention" and who appeared without counsel. The judgment is in six numbered paragraphs: Paragraph 1 adjudges the validity of said section 12.21-C of the ordinance; Paragraph 2, as set forth above, declares that the sales "referred to in the amended complaint" are "null and void"; Paragraph 3 declares that the transactions with the Girofilos are "null and void" and fixes the amount which was paid by the Girofilos in those transactions; Paragraphs 4 and 5 award costs to "defendants" and to "plaintiffs in intervention," respectively; and Paragraph 6 awards judgment for $1,862.14 and costs to the "cross-complainants in intervention," the Girofilos. Plaintiff appealed but no appeal was taken by any intervener; and no briefs have been filed herein by any of the parties other than plaintiff and the defendant city.

Upon this record we find no justification for the reversal or modification of the portion of the judgment declaring cer-

tain transactions "null and void," or for the reversal of any other portion of the judgment. This appeal, as originally developed by the briefs, was concerned only with the constitutionality of the ordinance in question. In the petition for rehearing and on rehearing, the main question presented was the propriety of the portion of the judgment declaring certain transactions in violation of the ordinance "null and void" rather than voidable. It appears, however, that this declaration in the judgment was made only with respect to those specific transactions referred to in the pleadings, which pleadings are not before us; and, in the absence of any contention to the contrary, we deem it appropriate to assume that a full transcript containing all pleadings and all proceedings on the trial would show that the validity of these particular transactions was properly challenged by the interveners. As we have concluded that such transactions were voidable, and as we may assume that the interveners could and did properly challenge their validity, there is no error in the trial court's declaration that such particular transactions are "null and void." Such is the legal effect of the avoidance of a voidable transaction by a party entitled to exercise that right. (*Depner* v. *Joseph Zukin Blouses*, 13 Cal.App.2d 124, 127 [56 P.2d 574]; see, also, *Myrick* v. *O'Neill*, 33 Cal.App.2d 644, 648 [92 P.2d 651]; 6 Cal.Jur. § 12, p. 29.) As we read paragraph 2 of the judgment, it does not purport to be a declaratory judgment to the effect that all transactions in violation of said section 12.21-C are "null and void" *ab initio* rather than voidable, but only that certain specific transactions, which had been avoided by the interveners, are now "null and void."

The purported appeal from the order denying a new trial is dismissed. The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., and Traynor, J., concurred.

CARTER, J.—I dissent.

Plaintiff, in 1945, bought a piece of property on which some nine bungalows had been built some 20 years previously. He then subdivided the property into nine parcels which averaged 925 square feet in size. Eight of these parcels were sold to individual purchasers in violation of a municipal ordinance which prohibited reduction of residential lots below 5,000 square feet of area with a 50-foot frontage. The property

purchased by the plaintiff is in a C-2 Zone, and the ordinance permits the present construction of the same type of units as those owned by the plaintiff on a lot area of 800 square feet per dwelling unit. But these units must be held in single ownership.

The property here involved is situated in a C-2 Zone for which the ordinance provides in part as follows:

"C-4. Lot Area. Buildings hereafter erected and used wholly or partly for dwelling purposes shall comply with the lot area requirements of the R4 Zone—Sec. 12.11-C, 4."

"Section 12.11-R4.

"C-4. Lot Area. Every lot shall have a minimum average width of fifty (50) feet and a minimum area of five thousand (5000) square feet. *The minimum lot area per dwelling unit shall be eight hundred (800) square feet.*" [Emphasis added.]

In *Devaney* v. *Board of Zoning Appeals,* 132 Conn. 537 [45 A.2d 828], the Supreme Court of Connecticut aptly stated that "Zoning consists of a general plan to control and direct the use and development of property in a municipality, or a large part of it, by dividing it into districts according to present and potential use of property." It has also been said that a zoning statute or ordinance is one regulating by districts the building development and uses of property and imposing restrictions on the use of the land itself. The term "zoning" within the meaning of a constitutional provision permitting laws authorizing zoning ordinances means a separation of the municipality into districts and the regulation of buildings and structures in such districts in accordance with their construction and the nature and extent of their use and the dedication of such districts to the particular uses designed to subserve the general welfare and pertains not only to use but to structural and architectural design of the building. (Yokley, Zoning Law and Practice.) In *Goodrich* v. *Selligman,* 298 Ky. 863 [183 S.W.2d 625], it was said that the theory of zoning is to foster improvements by confining certain classes of buildings and uses to certain localities without imposing undue hardship on property owners.

It would seem that the ordinance here involved is not the usual type of zoning ordinance, nor does it fall within the definitions given above insofar as it applies to the *ownership* of lots of a certain size. By it a restriction is placed on the ownership, *not the use,* of parcels of land below a certain specified area.

I concede that the objectives of zoning are within the

police power—that the public health, safety, morals and general welfare must be safeguarded. *But* there must be a rational connection between the means used and the end result to be attained. The majority opinion sets forth the reasons why this ordinance providing for single ownership of the units, rather than individual ownership, is a rational basis for the ordinance enacted under the police power of the municipality. These reasons would have validity if, and only if, the ordinance prohibited more than a single dwelling or two on each 5000 square foot parcel of land (which was heretofore used by the occupants of the nine bungalows). These reasons are: (1) Avoidance of congestion in the streets. The absurdity of this is apparent—because a man owns his own home, does he tend to make for greater congestion in the streets ? (2) Prevention of overcrowding the land—because a man owns his land, does he tend to have more children, more guests, more relatives ? (3) Facilitation in furnishing transportation, water, light, sewer and other public necessities—I may be obtuse, but it appears that this reason is less than valid. In bungalow courts, unfurnished apartments, and the like, each tenant usually pays for his own water, light, and public utilities—these facilities are furnished to him as an individual tenant, and have nothing whatsoever to do with his ownership of the property. The transportation argument seems so ridiculous as to require no answer. (4) Provision of recreational space for children to play—how can individual ownership of the various units have the slightest bearing on such space ? (5) Encouragement of the cultivation of flowers, shrubs, vegetables—it has been my experience that individual ownership tends toward the encouragement of interest in the land, rather than tending to diminish it, and the same argument applies so far as the upkeep of property is concerned. Tenants are only too willing to let the landlord take care of any repairs, and if the landlord fails to do so, the tenant is not willing to expend his funds on someone else's property. (6) As another reason we are told that a "probable increase in occupancy" would add to the noise and other irritations which militate against orderly, quiet and peaceful living. As I have pointed out previously, this is a valid argument if we are to prohibit absolutely such bungalow courts, but, in the very nature of things, can have no validity when we take into consideration the fact that these units will be occupied in the same manner whether or not they are individually owned. (7) Health and Sanitary regulations—this argument is equally

delusive. There is one incinerator and two sewer connections serving the nine units and it would seem that individual ownership would not make these services less adequate. There are common walkways which will need to be cleaned, we are told, and there are easements over other property which will need to be regulated. And on these very speculative and improbable future neighborhood squabbles, we are asked to say that the ordinance has a reasonable basis in that it will tend to promote the public health, welfare, safety and general well-being! A corollary of finding this ordinance a sound and rational exercise of the police power of the municipality is to restrain the free alienation of property.

The majority say that "The courts may differ with the zoning authorities as to the 'necessity or propriety of an enactment', but so long as it remains a 'question upon which reasonable minds might differ', there will be no judicial interference with the municipality's determination of policy." I am of the opinion now, as I have been in the past, that this court, when viewing a record on appeal, must sustain the findings of the trial court when there is substantial evidence in support thereof. The evidence in the instant case in support of the reasonableness of the ordinance appears to me to be sadly lacking. I fail to see that there *is* a question on which *"reasonable* minds might differ"! It seems to me that this is a clear case of arbitrary interference with the rights of an individual, and that the public gain from that interference is nonexistent.

The majority tell us that ". . . it is fairly arguable that numerous other advantages might well suggest themselves when one attempts to visualize the appearance of a sizable area of a city subdivided into lots akin in dimension, to those of plaintiff, upon each of which there stood an individually owned and maintained dwelling . . ." The fact remains that plaintiff's property is in a zone in which these bungalow units (under single ownership) are permitted by this ordinance. Just how an observer would be able to say whether or not they were individually owned and what difference that would make in one's visualization of the area in question, I am at a loss to understand. There is no reasonable relation between a reduction of the area of an improved lot, *without* change in its improvements, its use or its existing yard areas and the protection of the public health, safety, morals or welfare. The exercise of the police power, though an essential attribute of sovereignty for the public welfare and arbitrary

in its nature, cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private property. (*House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384 [153 P.2d 950].)

I consider it a duty of·this court—a duty imposed on it by the will of the people of the state—to protect the individual against state or municipal action which deprives an individual of a right guaranteed to him not only by the Constitution of the United States, but by the Constitution of the State of California, when that action is not validly necessary for the benefit of the public at large. I have long argued against stateism and for the protection of individual rights when it is not necessary that those rights should be abridged for the benefit of the public. I consider that the people of this state and of the United States voluntarily relinquished certain of their rights that they collectively might benefit, but that they did not intend that all individual rights should be so relinquished. Our Constitutions embody that intent, and they stand as shields protecting the individual against arbitrary state action. It is the duty of this court to hold those shields. I do not feel that the declaration in the majority opinion that this ordinance is a reasonable and valid exercise of the police power has any support in reason.

In affirming the judgment, the majority fall into the error of assuming, just because municipal legislation on zoning is involved, that every such restriction is valid and that it is beyond the power of this court to inquire into the reasonableness thereof. Ordinances *are* held invalid and unconstitutional (*Page* v. *City of Portland*, 178 Ore. 632 [165 P.2d 280] ; *Lee* v. *City of Chicago*, 390 Ill. 306 [61 N.E.2d 367] ; *Koch* v. *Toledo*, 37 F.2d 336; *American Wood Products Co.* v. *Minneapolis,* 35 F.2d 657; *Van Auken* v. *Kimmey*, 141 Misc. 105 [252 N.Y.S. 329] ; *Lombardo* v. *City of Dallas*, (Tex.Civ.App.) 47 S.W.2d 495; *Johnson* v. *Village of Villa Park*, 370 Ill. 272 [18 N.E.2d 887] ; *Village of Terrace Park* v. *Errett*, (Ohio) 12 F.2d 240; *Women's Kansas City St. Andrew's Soc.* v. *Kansas City*, (Mo.) 58 F.2d 593; *Glencoe Lime & Cement Co.* v. *City of St. Louis*, 341 Mo. 689 [108 S.W.2d 143] ), because unreasonable and discriminatory. "The courts usually will hold a zoning ordinance invalid when it clearly appears that the restrictions are arbitrary and unreasonable and have no substantial relation to health, safety, morals or the general welfare." (*State* v. *City of Miami*,

156 Fla. 784 [24 So.2d 705, 163 A.L.R. 577].) Zoning restrictions must bear a *substantial relation* to the promotion of public health, safety, morals or general welfare. (*Ex parte Angelus,* 65 Cal.App.2d 441 [150 P.2d 908]; *Grant* v. *Board of Adjustment,* 133 N.J.L. 518 [45 A.2d 184]; *Merrill* v. *City of Wheaton,* 379 Ill. 504 [41 N.E.2d 508]; *Zadworny* v. *City of Chicago,* 380 Ill. 470 [44 N.E.2d 426]; 140 A.L.R. 1369.)

The legislation here considered is arbitrary and discriminatory. It is arbitrary and unreasonable in that it has no substantial justification based on "imperious considerations of public health, morals, and safety, . . ." (*Miller* v. *Seaman,* 137 Pa.Super. 24 [8 A.2d 415].) It is discriminatory in that it prohibits *ownership* of small parcels of land in a district where *rental* of *lesser* parcels of land is permitted. As the court said in the case cited by the majority (*Simon* v. *Town of Needham,* 311 Mass. 560 [42 N.E.2d 516, 141 A.L.R. 688]): "A zoning by-law cannot be adopted for the purpose of setting up a barrier against the influx of thrifty and respectable citizens who desire to live there and who are able and willing to erect homes upon lots upon which fair and reasonable restrictions have been imposed nor for the purpose of protecting the large estates that are already located in the district." This ordinance discriminates against those wishing to live in the district in homes *owned* by them and favors those who wish only to rent property there. It definitely sets up a barrier and discriminates *against* thrifty persons of small means while favoring those who can afford to buy property and build small homes thereon for rental and income purposes.

In *Harmon* v. *City of Peoria,* 373 Ill. 594 [27 N.E.2d 525], the ordinance limited the houses in a district to one family dwellings. Nevertheless, an owner was permitted to use his house for a multiple family dwelling because there was no substantial relation between the police power and the ordinance inasmuch as under it there was no limit on the number of people that could be considered a family. Thus the test in the ordinance was really not the number of people in a house but whether they happened to consist of more than one family. The analogy to the instant case is pronounced. The ordinance here is not aimed at preventing more than one house on each 5,000 square feet. It only prevents separate ownership of the houses. The court in the Harmon case stated at page 528 [27 N.E.2d]: "Here, the validity of the ordinance as

applied to the entire subdivision is not challenged. In short, it is only to the extent that the ordinance applies to plaintiffs' property that an unreasonable exercise of the police power is claimed. . . . The Ordinance, it has been observed, defines a 'family' as one or more persons occupying premises and living together as a single housekeeping unit as opposed to a group occupying a boarding house, lodging house or hotel. Admittedly, a person may legally lodge and board four persons for remuneration upon premises located in an 'A' one-family district and, specifically, in the block where plaintiffs reside. Plaintiffs, it is conceded, enjoy the right under the ordinance to rent rooms to a maximum of four individual roomers and if they so desire, may serve meals to such persons. Indeed, any number of persons may occupy a house as a 'family,' within the contemplation of the ordinance, and divide the housekeeping expenses, provided only they live as a solitary housekeeping unit, using a single kitchen. Manifestly, the term 'one-family dwelling,' *bears no relation in fact to the number of persons or families living in a building.* On the other hand, the ordinance prohibits plaintiffs from renting their suits of rooms equipped with adequate kitchen facilities to two couples. The harsh reality of the distinction made by the ordinance is evidenced by the refusal of the zoning officials to permit the use last described. Tested in the light of the applicable principles set forth the distinction is unreasonable in the extreme, particularly since less than one-half of the residences in the block are actually used as single-family dwellings. The use of plaintiff's one-family residence by six persons maintaining three separate housekeeping units appears no more inimical to the public welfare than the devotion of their property to the accommodation of four roomers and boarders.'' [Emphasis added.]

The court states in *Women's Kansas City St. Andrew's Soc.* v. *Kansas City,* 58 F.2d 593, 603 : ''To justify such restriction the police power would have to be extended, not only to restricting certain districts to residence purposes, but to restricting such districts to *particular classes of residents,* and this has been quite universally condemned by the decisions.'' [Emphasis added.] The ordinance here restricts the class of persons—residents who may reside in the area involved for it permits renter residents but prohibits owner residents.

A zoning ordinance may be generally valid, but its enforcement with respect to particular property will be restrained

by the courts if it is unreasonable, arbitrary and discriminatory in its application thereto. (*Reynolds* v. *Barrett*, 12 Cal. 2d 244, 250, 251 [83 P.2d 29] ; *Skalko* v. *City of Sunnyvale*, 14 Cal.2d 213, 214, 216 [93 P.2d 93] ; *Bernstein* v. *Bush*, 29 Cal.2d 773, 777 [177 P.2d 913] ; *Hagenburger* v. *City of Los Angeles*, 51 Cal.App.2d 161, 163, 164 [124 P.2d 345].)

We are supposed to have a constitutional form of government where certain fundamental individual rights are guaranteed and protected. Section 1 of article I of our Constitution provides that ''All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and property; acquiring, possessing, and protecting property; and pursuing and obtaining safety and happiness.'' While I concede that the right to acquire and possess property is subject to the police power of the state in the advancement and protection of public health, safety, morals and general welfare, I think it is time for this court to declare that the police power of the state is so limited and that the right to own and possess property may not be impaired by the mere whim or caprice of any planning commission, city council, or board of supervisors which may have some pet notion about what use should be made by an individual of property owned by him. In other words, I do not believe that these public agencies should be permitted to interfere with the ownership or possession of property unless it can reasonably be said that such interference is necessary in the interests of public health, safety, morals or welfare. In my opinion, the determination of this issue is for the courts who must interpret and apply the constitutional safeguards for the protection of the property owner.

I positively do not agree with the philosophy announced in the recent decisions of this court (*Wilkins* v. *City of San Bernardino*, 29 Cal.2d 332 [175 P.2d 542] ; *Lockard* v. *City of Los Angeles*, 33 Cal.2d 453 [202 P.2d 38, 7 A.L.R.2d 990] ; and *Ayres* v. *City of Los Angeles*, 34 Cal.2d 31 [207 P.2d 1]), in which it has completely abdicated its judicial function in favor of the arbitrary and unreasonable action of city councils, as shown by the record in those cases, who recognize no constitutional limitation of their power to control the use of private property.

It may be that we are going to have to stand up and be counted in order to determine whether constitutional rights in the ownership and possession of property still exist. Such rights certainly will no longer exist when the decision in this

case takes its place beside the Wilkins, Lockard and Ayres cases herein cited. Under these decisions the right of ownership and possession of real property is subject to the whim and caprice of any planning commission, city council or board of supervisors and the restrictions which any one of them may place upon an individual's right to own, possess or use real property which will be upheld by a majority of this court is any one's guess—the sky may be the limit—certainly not the Constitution which has become a dead letter—a forgotten document.

When the Constitution is disregarded we reach the perimeter of the police state. True, city councilmen are elected, but what chance has a property owner who may be in the minority to protect himself against arbitrary and unreasonable action by a city council who may see fit to zone his property for a use for which it is wholly unsuited? This court has said it will not interfere with such action. Of what value to him is the inalienable right guaranteed by the Constitution to acquire, possess and protect property when a city council or board of supervisors tells him he can only use his property for a purpose dictated by whim or caprice and the courts refuse to grant him relief? The instant case is a shining example of such arbitrary action. The bungalow units were legally constructed and have been legally occupied, but they cannot be legally sold in separate units. Does this really make sense? Is there a scintilla of reason or logic behind such a rule? If there is, it is not apparent to me, and I doubt that it would be to any unprejudiced mind.

I am of the opinion that the ordinance is invalid and unconstitutional in its application to these facts in that the evidence discloses that it bears no reasonable relation to the legitimate objectives to be attained by an exercise of the police power, and that it is wholly arbitrary and discriminatory. I would reverse the judgment.

SCHAUER, J., Dissenting.—I agree with the conclusion of Mr. Justice Carter that the ordinance here involved, in its application to the facts of this case, is arbitrary and discriminatory. On the face of the majority opinion it appears, I think, that the ordinance as applied bears no reasonable relation to legitimate objectives of constitutional police power but, rather, effects an unwarranted curtailment of the rights of private ownership. By heretofore well established standards the judgment should be reversed.